UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DAWN F.,                          )
                                 )
            Plaintiff,           )
                                 )
      v.                         )     No. 1:20-cv-01374-RLY-DLP
                                 )
ANDREW M. SAUL,                  )
                                 )
            Defendant.           )

**REPORT AND RECOMMENDATION**

Plaintiff Dawn F.[1] requests judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of her application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c).

On February 10, 2021, United States District Judge Richard L. Young entered an Order referring this matter to the Undersigned for a report and recommendation regarding the appropriate disposition pursuant to 28 U.S.C. § 636. (Dkt. 15). For the reasons set forth below, the Undersigned recommends that this Court **REVERSE** the ALJ's decision denying the Plaintiff benefits and **REMAND** this matter for further consideration.

---

[1] The Southern District of Indiana has adopted the recommendations put forth by the Court Administration and Case Management Committee regarding the practice of using only the first name and last initial of any non-government parties in Social Security opinions. The Undersigned has elected to implement that practice in this Report and Recommendation.

## I.  PROCEDURAL HISTORY

On October 26, 2016, Dawn filed her application for SSI. (Dkt. 10-3 at 16, R. 78). Dawn alleged disability resulting from back injury, chronic pain, arthritis, depression, anxiety, and post-traumatic stress disorder ("PTSD"). (Dkt. 10-3 at 2-3, 30, R. 64, 65, 92). The Social Security Administration ("SSA") denied Dawn's claim initially on March 13, 2017, (Dkt. 10-3 at 2-16, R. 64-78), and on reconsideration on June 21, 2017. (Id. at 17-35, R. 79-97). On August 14, 2017, Dawn filed a written request for a hearing, which was granted. (Dkt. 10-4 at 18, R. 114).

On February 1, 2019, Administrative Law Judge ("ALJ") Crystal L. White-Simmons conducted a video hearing, where Dawn and vocational expert Diane D. Regan appeared. (Dkt. 10-2 at 35-64, R. 34-63). On April 26, 2019, ALJ White-Simmons issued an unfavorable decision finding that Dawn was not disabled. (Dkt. 10-2 at 16-29, R. 15-28). Dawn appealed the ALJ's decision and, on March 18, 2020, the Appeals Council denied Dawn's request for review, making the ALJ's decision final. (Dkt. 10-2 at 2, R. 1). Dawn now seeks judicial review of the ALJ's decision denying benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II.  STANDARD OF REVIEW

To qualify for disability, a claimant must be disabled within the meaning of the Social Security Act. To prove disability, a claimant must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that she is not able to perform the work she previously engaged in and, based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A).

The SSA has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 416.920(a).[2] The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [her] unable to perform [her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also* 20 C.F.R.

---

[2] The Code of Federal Regulations contains separate, parallel sections pertaining to disability benefits under the different titles of the Social Security Act, such as the one cited here that is applicable to supplemental security income benefits. Often, as is the case here, the parallel section pertaining to the other type of benefits—in this case disability insurance benefits—is verbatim and makes no substantive legal distinction based on the benefit type. *See* 20 C.F.R. § 404.920(a).

§ 416.920. (A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled.).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC is an assessment of what a claimant can do despite her limitations. *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004). In making this assessment, the ALJ must consider all the relevant evidence in the record. *Id.* at 1001. The ALJ uses the RFC at step four to determine whether the claimant can perform her own past relevant work and if not, at step five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. § 416.920(a)(4)(iv)-(v).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant – in light of her age, education, job experience, and residual functional capacity to work – is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(f).

Judicial review of the Commissioner's denial of benefits is to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). This review is limited to determining whether the ALJ's decision adequately discusses the issues and is

based on substantial evidence. Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Dawn is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

Under this administrative law substantial evidence standard, the Court reviews the ALJ's decision to determine if there is a logical and accurate bridge between the evidence and the conclusion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, she must build an "accurate and logical bridge from the evidence to [her] conclusion," *Clifford*, 227 F.3d at 872, articulating a

minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in her decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

### III.   BACKGROUND

#### A. Factual Background

Dawn was forty-two years old when she applied for SSI. (Dkt. 10-3 at 2, R. 64). She has completed high school and two years of college. (Id. at 33, R. 95; Dkt. 10-6 at 5, R. 217). She reported relevant past work as an insurance reviewer, medical assistant, restaurant manager, and kitchen helper. (Dkt. 10-2 at 28, R. 27; 10-3. at 13-14, 32, R. 75-76, 94).

#### B. Dawn's Medical History

On December 12, 2008, Dawn injured her back, neck, and right shoulder at work while lifting a patient into an ambulance. (Dkt. 10-5 at 22, 32, R. 186, 196). Thereafter, Dawn underwent a series of medical treatments, including therapies, work conditioning, selective nerve root injection, cervical fusion, and a "nerve burn," to treat her injuries. (Dkt. 10-5 at 22, R. 186).

On March 16, 2016, Dawn presented to Nurse Practitioner ("NP") Sherry L. Bender, with Indiana Internal Medicine Consultants, to establish new patient care.

(Dkt. 10-7 at 80-82, R. 388-390). NP Bender noted Dawn's past medical history, which included asthma, irritable bowel syndrome ("IBS"), anxiety, and depression; noted the variety of back treatment Dawn had undergone[3]; and reviewed Dawn's medications. (Dkt. 10-7 at 80, R. 388). At that time, Dawn was taking Gabapentin, though she felt it was ineffective for treating her pain as compared to the Lyrica she had been taking prior to becoming uninsured. (Id.). Dawn also reported taking Celexa for anxiety but did not believe it was helping. (Id.). Dawn reported experiencing pain in her upper and lower back, and, on physical examination, NP Bender found that Dawn had paravertebral tenderness of the upper and mid-thoracic spine. (Id. at 80-81, R. 388-89). NP Bender's impression was that Dawn suffered from depression, general anxiety disorder, insomnia, obesity, headache, thoracic back pain, low back pain, and anxiety. (Id.). She restarted Dawn on Lyrica, continued her on Celexa, and referred Dawn to a psychiatrist for her anxiety and depression and to Goodman Campbell Brain and Spine for her thoracic and lumbar spine pain. (Id. at 81, R. 389).

On November 8, 2016, Dawn saw Nurse Practitioner Beverly Loudermilk of Saint Francis Family Medicine to establish care after obtaining new insurance. (Dkt. 10-8 at 8-10, R. 509-11). Dawn complained of anxiety and depression but noted that Ativan and Celexa had helped with these ailments (though at the time of the visit, Dawn had been out of her Celexa prescription for about a month). (Id. at 8,

---

[3] At this point, Dawn had undergone thoracic and lumbar laminectomies, placement of two peripheral nerve stimulator electrodes, cervical spinal fusion, and pain management. (Dkt. 10-7 at 80, R. 388).

R. 509). Dawn reported that she has chronic back pain, has undergone multiple surgeries, was taking Lyrica[4], and was scheduled to see Goodman Campbell Brain and Spine that month related to her back pain. (Dkt. 10-8 at 8, R. 509). NP Loudermilk noted that Dawn was positive for depression and anxiety and that she exhibited normal range of motion on physical examination. (Id. at 9, R. 510). She prescribed Celexa and Buspar.[5] (Id. at 10, R. 511).

On November 29, 2016, Dawn presented to Goodman Campbell Brain and Spine for referral for her low back pain. (Dkt. 10-7 at 171, R. 479). Nurse Practitioner Lora Meyer noted Dawn's history of chronic neck and back pain, Dawn's neck and back procedures, and that in 2013, one of Dawn's physicians, Dr. Barbaro, opined that Dawn had maximally medically improved. (Id.). During the visit, Dawn reported pain in her lower back and left scapular region that started approximately six months prior, which was not caused by a new injury, inciting event, or activity. (Id.). Dawn described the left scapular pain as a tingling/burning sensation, and the low back pain as a non-radiating deep ache that worsened with standing prolonged periods of time or leaning over the sink to do dishes. (Id.). Dawn informed NP Meyer that she wanted to see if anything could be done for her back pain but was not interested in any further surgeries. (Id.).

---

[4] Lyrica is a prescription medication indicated to treat fibromyalgia, diabetic nerve pain, spinal cord injury nerve pain, and pain after shingles in adult patients. *Lyrica*, https://www.lyrica.com/ (last visited August 31, 2021).
[5] Buspar is a prescription medication used to treat anxiety. *Buspar Tablet,* WEBMD, https://www.webmd.com/drugs/2/drug-9036/buspar-oral/details (last visited August 31, 2021).

On physical examination, NP Meyer noted that Dawn had increased pain with lumbar flexion, tenderness to palpation in the lower lumber paraspinal musculature, a positive straight leg raise to the back bilaterally, and brisk deep tendon reflexes in the upper and lower extremities. (Dkt. 10-7 at 172, R. 480). Since Dawn had not undergone any physical or conservative therapies for this pain, NP Meyer recommended that Dawn work on losing weight and undergo a formal course of physical therapy to see if her pain improves. (Id.). Given Dawn's desire to avoid surgical procedures, NP Meyer planned to refer Dawn to a chronic pain management specialist if weight loss and physical therapy proved unsuccessful in remedying Dawn's pain. (Id.).

On December 9, 2016, Dawn returned to NP Loudermilk complaining of lumbar back pain not caused by injury that was different and unrelated to her history of mid-back pain with multiple surgeries. (Dkt. 10-8 at 41, R. 542). Dawn reported difficulty bending and lifting. (Id.). She also stated that heat, Tylenol, and Ibuprofen failed to remedy her pain. (Id.). On physical examination, Dawn exhibited tenderness "midline and L lumbar TTP, tearful with movements," with no swelling; maximum flexion forward from waist of approximately 60 degrees; and pain with left straight leg raise at 45 degrees. (Id. at 42, R. 543). NP Loudermilk diagnosed Dawn with acute midline low back pain without sciatica and anxiety. (Id). She also ordered an X-ray of Dawn's spine, prescribed Robaxin and Ibuprofen for back pain, and advised Dawn to continue her anxiety and depression medications given Dawn's report that she was doing well on them. (Id. at 41-42, R. 542-43).

On December 27, 2016, Dawn saw Dr. Srinivas Doraswamy of Greenwood Pain Management to establish new patient care. (Dkt. 10-7 at 107, R. 415). Dawn's chief complaints were neck pain and back pain, which she rated as 6/10 and 7/10 and stated were aggravated by walking, sitting, standing, and lying down. (Id.). Dawn noted that heat and rest improved her pain. (Id.). Dr. Doraswamy noted Dawn's past results with conservative therapy, including 10-15% pain relief with 2009 physical therapy, relief with Oxycontin, and only a couple days' relief with steroid injections in 2009 and 2010. (Id. at 108, R. 416). On physical examination, Dawn appeared to be in pain and exhibited tenderness upon palpation at C5, C6, C7, L3, L4, L5, and midline bilaterally at T8 – T10. (Id. at 108, R. 416). Dawn also exhibited tenderness and pain at her right sacroiliac joint. (Id.). Dr. Doraswamy diagnosed Dawn with cervicalgia; spondylosis without myelopathy or radiculopathy, cervical and thoracic regions; pain in thoracic spine; low back pain; spondylosis without myelopathy, lumbar; and sacroiliitis. (Id.). Dr. Doraswamy ordered a lumbar sacral orthosis and referred Dawn to physical therapy. (Id. at 108-109, 136, R. 416-17, 444). The next day, December 28, 2016, Dawn returned to Dr. Doraswamy for a bilateral sacroiliac joint injection to treat her intractable lower bilateral lumbosacral pain symptoms. (Dkt. 10-7 at 112, R. 420). Dawn was instructed to return in a month for a follow-up visit. (Id. at 113, R. 421).[6]

On January 5, 2017, Dawn presented to psychiatric Nurse Practitioner Amina Clinker for referral for her depression, anxiety, mood swings, and psychotic

---

[6] Based on the Court's review of Dawn's medical records, it is unclear if Dawn returned for a follow-up visit.

symptoms. (Dkt. 10-7 at 140, R. 448). At that time, Dawn was taking Celexa for depression, Buspar for anxiety, and Trazodone for insomnia; though Dawn complained that Celexa was making her depression worse. (Id.). Dawn also reported participating in counseling as a teenager but refused the idea of restarting counseling at this time. (Id). NP Clinker noted that Dawn was positive for headaches, IBS, and seizures, which were being managed by other providers. (Id.). NP Clinker discontinued Celexa and started Dawn on Latuda; she advised Dawn to continue taking Buspar and Trazodone. (Dkt. 10-7 at 140-41, R. 448-49). NP Clinker noted that Dawn had adequate attention span, though Dawn reported impairments with her concentration. (Id. at 143, R. 451). NP Clinker diagnosed Dawn with Bipolar II disorder, major depressive episode; mood changes; generalized anxiety disorder; hallucinations; and history of PTSD. (Id.). NP Clinker recommended that Dawn restart counseling, limit caffeine, exercise as tolerated, and follow up in a month. (Id. at 144, R. 452).

Following Dr. Doraswamy's physical therapy referral, Dawn presented to ATI Physical Therapy on January 11, 2017 for an initial evaluation. (Dkt. 10-7 at 135, R. 443). Dawn reported increased low back pain with prolonged sitting, standing, and walking. (Id.). She also reported limitations with bed mobility, bending, emptying the dishwasher, making her bed, driving, lifting from the floor and overhead, overhead tasks, transferring in and out of chairs and bed, sitting for more than 30 minutes, sleeping for more than 4 hours, standing for more than 15 minutes, and walking community distances. (Id.). Physical Therapist Jacob Crist noted that

Dawn exhibited tightness in flexibility, stiffness and pain in the lumbar and sacroiliac joints, and tenderness along her lumbar paraspinals and posterior hip complexes. (Dkt. 10-7 at 135, R. 443). PT Crist established a plan to treat Dawn 2-3 times a week for 6 weeks, with progression to a comprehensive home exercise program upon discharge. (Id.). Between January 11, 2017 and January 23, 2017, Dawn attended five physical therapy sessions during which the amount of time she was able to spend completing therapeutic exercises gradually increased. (Dkt. 10-7 at 127, 129, 131, 132, 134, R. 435, 437, 439, 440, 442). On February 2, 2017, Dawn discharged herself from physical therapy earlier than advised by PT Crist. (Dkt. 10-7 at 125-26, R. 433-34).

Also, on February 2, 2017, Dawn returned to NP Clinker for medication management and a follow-up visit. (Dkt. 10-7 at 137, R. 445). Dawn reported that she had stopped taking Latuda due to weight gain and because she felt it was not helping; however, she remained compliant with her Celexa and Trazodone prescriptions. (Id.). NP Clinker discontinued Buspar since Dawn reported that the medication was ineffective in controlling her anxiety, and she started Dawn on Ativan. (Id.). During the exam, NP Clinker noted that Dawn had adequate concentration and attention span. (Id. at 138, R. 446). NP Clinker recommended counseling. (Id. at 139, R. 447).

On February 22, 2017, NP Clinker wrote a letter in support of Dawn's application for food stamps, noting that Dawn still complained of racing thoughts and hallucinations, and was not responding to medication management. (Dkt. 10-7

at 175, R. 483). NP Clinker noted her plan to start Dawn on Vraylar and her referral to therapy. (Id.). NP Clinker opined that Dawn is not able to work until she is stable on medication management, given her anxiety, depression, hallucinations, irritability, mood swings, and obsessive thoughts. (Id.).

On March 2, 2017, Dawn saw NP Clinker for a follow-up visit and medication management. (Dkt. 10-7 at 151, R. 459). At the visit, Dawn stated that she was pursuing disability and has a hearing in a week. (Id.). Dawn reported that Vraylar was effectively controlling her psychotic symptoms; that Celexa and Ativan were effectively treating her depression and anxiety; and that she was not experiencing any medication side effects. (Id.). NP Clinker noted that Dawn's attention span and concentration were adequate. (Id. at 151-52, R. 459-60). She advised that Dawn discontinue Trazodone, as Dawn had stopped taking it, and continue taking Celexa, Vraylar, and Ativan. (Id. at 153-54, R. 461-62).

On March 7, 2017, Dawn presented to Clinical Psychologist Melissa Sprinkle for a consultative examination. (Dkt. 10-7 at 160-167, R. 468-75). Dawn reported suffering from Bipolar II Disorder, anxiety disorders, chronic back pain, and PTSD. (Id. at 160, R. 468). Dawn stated that she could not work because of her struggles with concentration and inability to sit for more than 15 minutes or stand for more than 20 minutes without pain. (Id.). Dawn reported participating in mental health treatment during her teens and 20's, but not currently participating in mental health treatment. (Id. at 161, R. 469). Dawn also reported that she is able to tend to

her personal care and household chores, though she experiences pain, requires some assistance and cannot stand long enough to cook. (Dkt. 10-7 at 162, R. 470).

Dr. Sprinkle opined that Dawn's clinical interview, chart, and mental status examination supported diagnoses of Bipolar II Disorder, depression, generalized anxiety disorder, alcohol use disorder, unspecified schizophrenia spectrum and other psychotic disorder, and PTSD. (Dkt. 10-7 at 165, R. 473). Dr. Sprinkle also opined that while Dawn's psychiatric symptoms appear to impact her daily functioning, quality of life, and social functioning, Dawn is still able to function in her daily life. (Id.). Dr. Sprinkle found that Dawn's attention and concentration were adequate, and that Dawn could track and transition in conversation, focus for sustained periods of time, get along with others, and respond appropriately to changes in her work environment. (Id). Dr. Sprinkle noted that given Dawn's psychiatric symptoms, she may struggle with motivation and energy to work. (Id.). Taken together, Dr. Sprinkle believed Dawn's psychiatric symptoms would moderately impact her ability to perform daily and work activities. (Id.).

On March 9, 2017, Dawn presented to Dr. Alison Williams for upper and low back pain, which she characterized as constant burning, stabbing, and tingling pain. (Dkt. 10-9 at 98-101, R. 778-781). Dawn described her pain as 6/10 with medication and 8/10 without. (Id. at 98, R. 778). During the visit, Dawn reported that her spinal cord stimulators were not providing relief; that she had participated in physical therapy in the past, which made her pain worse; that prior injections had not provided relief; and that she was taking Lyrica and Norco, though she did

14

not believe either were providing effective relief. (Dkt. 10-9 at 98, R. 778). Dawn reported no medication side effects. (Id.). Dawn also reported a history of asthma, IBS, gait disturbance, neck and back pain, bipolar disorder, and depression. (Id.). On review of symptoms, Dr. Williams noted that Dawn experienced weight gain due to medication, joint pain, stiffness, dizziness and loss of balance, leg weakness, and depressed and anxious mood. (Id.). Dr. Williams also noted that Dawn's bilateral paraspinal muscles were tender to palpation and her FABER test[7] was negative. (Id.). She diagnosed Dawn with spondylosis without myelopathy or radiculopathy, cervical region, and other spondylosis in her lumbar and thoracic regions. (Id. at 100, R. 780). Dr. Williams increased Dawn's Norco and Lyrica prescriptions and started Dawn on a home exercise program. (Id.).

On March 29, 2017, Dawn saw Dr. Williams for back pain radiating down to her knee, which had worsened approximately one week prior. (Dkt. 10-9 at 95, R. 775). Dawn reported that Norco did not help much, though heat packs and stretching seemed to help; she also reported that her pain was exacerbated by rest and standing or sitting for long periods of time. (Id.). Dr. Williams noted Dawn's negative FABER test, her negative bilateral straight leg test, and that her bilateral paraspinal muscles and right sacroiliac joints were tender to palpation. (Id. at 96, R.

---

[7] The flexion abduction external rotation (FABER) test is used to evaluate for pathology of the sacroiliac joint. During the test, the patient lies face up on the examination table and is asked to place one foot on the opposite knee. While supporting the pelvis with one hand, the physician presses firmly down on the flexed knee while supporting the pelvis at the opposite anterior superior iliac spine. A positive finding is pain in the sacroiliac joint of the leg being tested. Bradley J. Sandella et al., *What is the role of Patrick-FABER test in the evaluation of low back pain (LBP)?*, MEDSCAPE (May 15, 2018), https://www.medscape.com/answers/2092651-119404/what-is-the-role-of-patrick-faber-test-in-the-evaluation-of-low-back-pain-lbp.

776). Dr. Williams advised that Dawn stop Norco and Robaxin, start Percocet and Baclofen, and continue Lyrica and her home exercise program. (Dkt. 10-9 at 97, R. 777).

Dawn returned to Dr. Williams on May 11, 2017. (Dkt. 10-9 at 92-94, R. 772-774). Dawn reported back pain with general activity, which she rated at 4 out of 10, that was relieved with medication. (Id. at 92, R. 772). Dawn claimed she was doing "much better," and had improved function and mobility. (Id.). She reported no medication side effects and that Baclofen worked better than Robaxin. (Id.). Dr. Williams noted that Dawn's FABER test and bilateral straight leg tests were negative and that Dawn's bilateral paraspinal muscles and right sacroiliac joints were tender to palpation. (Id. at 94, R. 774). Dr. Williams advised Dawn to continue her Percocet, Lyrica, Baclofen, and home exercise program. (Id.).

On May 25, 2017, Dawn saw NP Clinker for medication management. (Dkt. 10-9 at 61, R. 741). Dawn reported decreased effectiveness with Vraylar; however, Trazadone, Ativan, and Celexa continued to help her insomnia, anxiety, and depression, respectively. (Id.). NP Clinker noted that Dawn's attention span and concentration were adequate and that her gait was steady and antalgic.[8] (Id. at 62, R. 742). NP Clinker increased Dawn's Vraylar prescription. (Id. at 61, R. 741).

Dawn returned to NP Clinker nearly one month later, on June 22, 2017, and reported that Vraylar has been effective in minimizing her hallucinations, rumination, and depression; and Trazadone and Celexa remained effective for

---

[8] "Antalgic gait" refers to walking with a limp that is caused by pain. *Antalgic Gait*, HEALTHLINE, https://www.healthline.com/health/antalgic-gait (last visited August 31, 2021).

treating her insomnia and depression, respectively. (Dkt. 10-9 at 59, R. 739). Dawn reported using Ativan sparingly for her anxiety. (Id.). Dawn also reported no medication side effects. (Id.). NP Clinker noted that Dawn's attention span and concentration were adequate and that her gait was steady and antalgic. (Id. at 60, R. 740). NP Clinker directed Dawn to follow-up in four months. (Id. at 59, R. 739).

On July 6, 2017, Dawn presented to Dr. Williams for low back pain, which she described as a constant aching, burning, dull, sharp, shooting, and stabbing pain with general activity that was relieved with medication. (Dkt. 10-9 at 88, R. 768). Dawn rated her pain as 5 out of 10. (Id.). Dawn noted that she was doing well on Percocet and had no medication side effects. (Id.). Dawn reported that her nerve pain had worsened due to one of the batteries in her spinal stimulator dying. (Id.). Dr. Williams noted that Dawn's bilateral paraspinal muscles and right sacroiliac joints were tender to palpation, and that her FABER and bilateral straight leg tests were negative. (Id. at 90, R. 770). Dr. Williams diagnosed Dawn with spondylosis without myelopathy or radiculopathy, cervical region, and neuralgia and neuritis, unspecified. (Id.). Dr. Williams advised that Dawn continue Percocet, Baclofen, Diclofenac, and her home exercise program, and increase her Lyrica dosage. (Id.). Dr. Williams referred Dawn to neurosurgery for evaluation of her spinal cord stimulator ("SCS") battery replacement. (Id.).

On August 29, 2017, Dawn saw Dr. Albert E. Lee of Goodman Campbell Brain and Spine to discuss replacement of her St. Jude batteries for her SCS. (Dkt. 10-7 at 188, R. 496). Dr. Lee advised that Dawn go to the pre-admission testing

clinic ("PAT") to ensure Dawn is cleared for surgery, and he planned to schedule Dawn's surgery depending on her PAT clearance. (Dkt. 10-7 at 188, R. 496).

A week later, on September 5, 2017, Dawn presented to Dr. Williams, and reported constant aching, burning, dull, sharp, and stabbing back pain with general activity, which was relieved with medication, heat, and rest. (Dkt. 10-9 at 85, R. 765). Dawn rated her pain as 5 out of 10. (Id.). Dawn noted that she was doing better with the increased Lyrica and reported no medication side effects; however, Dawn was experiencing some constipation due to her pain medication. (Id.). Dr. Williams again noted that Dawn's bilateral paraspinal muscles and right sacroiliac joints were tender to palpation, and that Dawn's FABER and bilateral straight leg tests were negative. (Id. at 86-87, R. 766-67). Dr. Williams advised that Dawn continue Percocet, Lyrica, Baclofen, Diclofenac, and her home exercise program. (Id. at 87, R. 767).

During Dawn's October 26, 2017 medication management appointment, NP Clinker noted that Vraylar remained effective for controlling Dawn's psychotic symptoms, and that Trazodone and Ativan were helping with Dawn's insomnia and anxiety. (Dkt. 10-9 at 56, R. 736). NP Clinker discontinued Dawn on Celexa and started her on Zoloft. (Id.). She also noted that if Dawn failed Zoloft, she would recommend GeneSight[9] since Dawn had previously tried and failed numerous antidepressant medications. (Id.). NP Clinker observed that Dawn's attention span

---

[9] GeneSight is a pharmacogenomic test that analyzes how a person's genes may affect medication outcomes, which can help inform the person's doctor about how the person may respond to medications prescribed to treat depression, anxiety, ADHD, and other psychiatric conditions. *What is the GeneSIght test?*, GENESIGHT, https://genesight.com/ (last visited August 31, 2021).

and concentration were adequate and that her gait was steady and antalgic. (Dkt. 10-9 at 57, R. 737).

On November 22, 2017, Dawn returned to NP Clinker and reported feeling "more even" since augmenting Vraylar with Zoloft. (Dkt. 10-9 at 53, R. 733). Dawn also reported that Ativan helped control her anxiety and Trazodone her insomnia. (Id.). NP Clinker noted that Dawn's attention span and concentration were adequate and that her gait was steady and antalgic. (Id. at 54, R. 734).

On December 4, 2017, Dawn presented to Dr. Williams for back pain. (Dkt. 10-9 at 81-84, R. 761-764). Dawn reported constant pain with sitting, standing, and walking, which was relieved with medication, heat, and stretching. (Id. at 81, R. 761). Dawn rated her pain as 5 out of 10; she also stated that her pain was well-controlled on the current regimen, that her constipation had improved, and that she had no other side effects. (Id.). Dr. Williams noted that Dawn's bilateral paraspinal muscles and right sacroiliac joints were tender to palpation, and also noted Dawn's negative FABER and bilateral straight leg tests. (Id. at 83, R. 763). Dr. Williams advised that Dawn continue Percocet, Lyrica, Baclofen, Diclofenac, and her home exercise program. (Id. at 84, R. 764).

On December 21, 2017, Dawn underwent surgery for a generator change to her spinal cord stimulators. (Dkt. 10-7 at 176, 189-90, R. 484, 497-98). In the admitting notes, Nurse Practitioner Marcie Judge noted Dawn's numerous past surgeries[10] and that Dawn has had good relief from the spinal cord stimulators.

---

[10] At the time of this generator change, Dawn had undergone a laminectomy with exploration and/or decompression of spinal cord and/or cauda equina, without facetectomy, foraminotomy or discectomy

(Dkt. 10-7 at 176-77, R. 484-85). Following the procedure, Dawn reported that her low back pain had improved with the placement of the SCS. (Dkt. 10-7 at 192-93, R. 500-01).

On February 27, 2018, Dawn saw Dr. Williams for back pain, which she reported as constant pain with general activity that was relieved with medication. (Dkt. 10-9 at 77, R. 757). Dawn rated her pain as 5 out of 10. (Id.). Dawn reported having palpitations and wanting to wean off Diclofenac as a result. (Id.). Dawn reported experiencing pain at the location of her left SCS battery as well as stiffness and increased pain in her lower back. (Id.). She also reported being stable on Percocet with no medication side effects. (Id.). Dr. Williams noted that Dawn's bilateral paraspinal muscles and right sacroiliac joints were tender to palpation, and that her FABER and bilateral straight leg tests were negative. (Id. at 79, R. 759). Dr. Williams diagnosed Dawn with palpitations; spondylosis without myelopathy or radiculopathy, cervical region; neuralgia and neuritis, unspecified; low back pain; and other spondylosis, lumbar region. (Id.). She advised Dawn to continue Percocet, Lyrica, Baclofen, and her home exercise program; wean off of Diclofenac; and follow-up with her surgeon regarding her battery replacement pain and with her primary care physician regarding her palpitations. (Id. at 80, R. 760).

---

(e.g. spinal stenosis), 1 or 2 vertebral segments in the cervical and thoracic spine; laminectomy for implantation of neurostimulator electrodes, plate/paddle, epidural; removal of spinal neurostimulator electrode percutaneous array(s), including fluoroscopy, when performed; laminectomy for implantation of neurostimulator electrodes, plate/paddle, epidural; insertion or replacement of spinal neurostimulator pulse generator or receiver, direct or inductive coupling; 9 back surgeries to review wire placements; 2 paddle lead placements; anterior cervical spinal fusion; spinal cord stimulator placement; and 2 thoracic laminectomies. (Dkt. 10-8 at 177, R. 485).

On March 14, 2018, Dawn saw NP Clinker for medication management. (Dkt. 10-9 at 50, R. 730). Dawn reported stopping Zoloft on her own due to inefficacy. (Id.). NP Clinker started Dawn on Trintellix and noted that Dawn had been compliant with Vraylar, Trazadone, and Ativan. (Id.). NP Clinker observed that Dawn's attention span and concentration were adequate and that her gait was steady and antalgic. (Id. at 51, R. 731).

Dawn returned to NP Clinker the following month, on April 12, 2018, for medication management. (Dkt. 10-9 at 48, R. 728). Dawn reported overall compliance with her medications but noted that she had stopped taking Trintellix shortly after starting due to headaches. (Id.). NP Clinker noted that Dawn's attention span and concentration were adequate and that her gait was steady and antalgic. (Id. at 49, R. 729).

On April 25, 2018, Dawn saw NP Loudermilk for bilateral leg weakness that she had been experiencing for at least two months. (Dkt. 10-8 at 153, R. 654). Dawn described her legs as feeling heavy about once a week, and that she was losing balance daily but had not fallen. (Id.). NP Loudermilk referred Dawn to neurology. (Id. at 155, R. 656).

On May 22, 2018, Dawn returned to Dr. Williams. (Dkt. 10-9 at 73-76, R. 753-756). Dawn reported that her legs feel like they are going to give out and that her legs feel very heavy when she is sitting down. (Id. at 73, R. 753). Dawn also reported that she was scheduled to have an appointment with the neurologist on June 5. (Id.). On physical examination, Dr. Williams noted that Dawn was tender to

palpitation of her bilateral paraspinal muscles and her right sacroiliac joints, her FABER and bilateral straight leg tests were negative, and that Dawn exhibited 17 of 18 fibromyalgia tender points. (Dkt. 10-9 at 75, R. 755). Dr. Williams diagnosed Dawn with spondylosis without myelopathy or radiculopathy, cervical region; neuralgia and neuritis, unspecified; low back pain; fibromyalgia; and other chronic pain. (Id.). Dr. Williams advised that Dawn continue Percocet, Lyrica, Baclofen, and her home exercise program; wean off of Diclofenac; start Cymbalta; and follow-up with a surgeon as needed. (Id.). For Dawn's fibromyalgia, Dr. Williams recommended Dawn continue her medication, practice good sleep hygiene, and exercise. (Id. at 75, R. 755).

During Dawn's July 5, 2018 medication management appointment with NP Clinker, Dawn reported that her symptoms were well-managed with her current regimen of Zoloft, Cymbalta, Vraylar, Ativan, and Trazodone. (Dkt. 10-9 at 45-46, R. 725-26). However, since Dawn noted some increased anxiety and requested that her Ativan dose be increased, NP Clinker increased the dosage. (Id. at 46-47, R. 726-27). NP Clinker noted that Dawn's attention span and concentration were adequate, and that Dawn's gait was at a slowed pace and she was using a cane. (Id. at 46, R. 726).

On August 14, 2018, Dawn presented to Dr. Williams for back and knee pain, which she described as constant aching and sharp pain exacerbated by bending forward, lifting, standing, and walking. (Dkt. 10-9 at 69, R. 749). She rated her pain as 4 out of 10 and said it was relieved by medication and rest. (Id.). Dawn reported that she was stable on medication, with no side effects, and was able to lose 10

pounds as a result of her home exercise program. (Dkt. 10-9 at 69, R. 749). On physical examination, Dr. Williams noted that Dawn was tender to palpitation of her bilateral paraspinal muscles and her right sacroiliac joints, her FABER and bilateral straight leg tests were negative, and that Dawn exhibited 17 of 18 fibromyalgia tender points. (Id. at 71, R. 751). Dr. Williams advised that Dawn continue her medications, practice good sleep hygiene, exercise, and follow-up with a surgeon as needed. (Id. at 72, R. 752).

During Dawn's August 30, 2018 medication management appointment, Dawn noted that her anxiety was better controlled since increasing Ativan. (Dkt. 10-9 at 43, R. 723). Dawn reported increased depression due to ongoing discord at home, so NP Clinker increased Dawn's Zoloft dosage. (Id.). NP Clinker noted that Dawn's attention span and concentration were adequate and that her gait was steady and antalgic. (Id.). NP Clinker strongly recommended counseling. (Id.).

On September 27, 2018, Dawn returned to NP Clinker for medication management. (Dkt. 10-9 at 41, R. 721). Dawn admitted stopping Vraylar because it was making her "too fatigued" but requested to restart Vraylar at a lower dose because she did feel better on the medication. (Id.). Dawn also reported that her depression and anxiety had improved. (Id.). NP Clinker noted that Dawn's attention span and concentration were adequate and that her gait was steady and antalgic. (Id. at 41-42, R. 721-22). NP Clinker continued to recommend counseling. (Id. at 41, R. 721).

On October 26, 2018, Dawn presented to Licensed Marriage and Family Therapist Dana Haram following referral from NP Clinker. (Dkt. 10-9 at 107, R. 787). Therapist Haram established a treatment goal and objective, with the plan being for Dawn to participate in individual counseling sessions on a weekly to bi-weekly basis. (Id. at 112, R. 792). Dawn returned to Therapist Haram one week later, on November 2, 2018. (Dkt. 10-9 at 112, R. 792). Therapist Haram noted that Dawn seemed to be building a rapport with her and opening up about her situation. (Id. at 114, R. 794). She opined that this openness would aid Dawn's ability to begin positive progress with her mental health. (Id.). She planned to continue meeting with Dawn weekly to bi-weekly based on availability. (Id.).

On November 6, 2018, Dawn presented to Dr. Williams for back and knee pain, which she described as constant aching and sharp pain exacerbated by bending forward, lifting, standing, and walking. (Dkt. 10-9 at 65, R. 745). Dawn rated her pain as 4 out of 10 and stated that medication and rest relieved her pain. (Id.). Dr. Williams noted that Dawn was upset because her insurance denied Lyrica, which she had been on for a long time, and she had to switch to Gabapentin. (Id.). Dawn reported no medication side effects. (Id.). On physical examination, Dr. Williams noted that Dawn was tender to palpitation of her bilateral paraspinal muscles and her right sacroiliac joints, her FABER and bilateral straight leg tests were negative, and that Dawn exhibited 17 of 18 fibromyalgia tender points. (Id. at 67, R. 747). Dr. Williams advised that Dawn continue her medications, practice good sleep hygiene, exercise, and follow-up with a surgeon as needed. (Id. at 68, R. 748).

Dr. Williams noted that Dawn was still working on scheduling her neurologist appointment. (Dkt. 10-9 at 68, R. 748).

Dawn returned to Therapist Haram ten days later, on November 16, 2018. (Dkt. 10-9 at 114, R. 794). Dawn reported that her greatest concern was her anxiety about attending the appointment, and she stated that she felt uncomfortable speaking with Therapist Haram because she hasn't been in counseling since she was a teenager. (Id.). Dawn expressed a desire to reduce her sessions to monthly; Therapist Haram advised that was possible but recommended that Dawn continue with bi-weekly therapy. (Id. at 115, R. 795). Therapist Haram noted that Dawn showed a small amount of progress in that she was attempting to make healthier coping choices, and that while Dawn reported struggling to come in for therapy, when in session, Dawn appeared fairly comfortable and open. (Id.).

On January 2, 2019, Dr. Williams completed a physical residual functional capacity questionnaire. (Dkt. 10-9 at 102-106, R. 782- 786). Dr. Williams reported that Dawn suffered from severe back pain in the lumbar region, fibromyalgia pain all over her body, and left knee and ankle pain, lasting or that can be expected to last at least 12 months. (Id. at 102, R. 782). Dr. Williams opined that Dawn's depression and anxiety contribute to the severity of her symptoms and functional limitations, and that Dawn's pain and other symptoms were severe enough to constantly interfere with her attention and concentration. (Id. at 103, R. 783). Dr. Williams opined that Dawn is incapable of tolerating even "low stress" jobs; can walk 1-2 city blocks without rest or severe pain, sit for an hour before needing to get

25

up, stand for 45 minutes before needing to sit down or walk around, and sit, stand, and walk for less than 2 hours in an 8-hour workday; can frequently lift less than 10 pounds, occasionally lift 10 pounds, and never lift more than 20 pounds; can rarely twist, stoop, crouch, and climb stairs; and should never climb ladders or balance. (Dkt. 10-9 at 103-05, R. 783-85). Dr. Williams opined that Dawn would likely be absent from work more than four days per month. (Id. at 105, R. 785).

### C. ALJ Decision

In determining whether Dawn qualified for benefits under the Act, the ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920(a) and concluded that Dawn was not disabled. (Dkt. 10-2 at 16-29, R. 15-28). At Step One, the ALJ found that Dawn had not engaged in substantial gainful activity since her October 26, 2016 application date.[11] (Id. at 18, R. 17).

At Step Two, the ALJ found that Dawn suffered from the following severe impairments: failed back syndrome, status post spinal cord stimulator implantation; cervical spondylosis; obesity; schizophrenia spectrum disorder; bipolar disorder; generalized anxiety disorder; and post-traumatic stress disorder ("PTSD"). (Id. at 18-20, R. 17-19). The ALJ found that Dawn's posterior tibial tendon dysfunction, left foot hallux valgus, left leg cellulitis, and alcohol use disorder impairments were non-severe. (Id. at 18-19, R. 17-18). The ALJ also determined that Dawn's fibromyalgia was not a medically determinable impairment. (Id. at 19, R. 18).

---

[11] SSI is not compensable before the application date. 20 C.F.R. § 416.335.

At Step Three, the ALJ found that Dawn's impairments did not meet or medically equal the severity of one of the listed impairments in the Listings. (Dkt. 10-2 at 20-21, R. 19-20). The ALJ determined that Dawn's impairments did not meet or medically equal the severity of Listing 1.04 for her spinal disorders, Listing 12.03 for her schizophrenia spectrum disorder, Listing 12.04 for her bipolar disorder, Listing 12.06 for her generalized anxiety disorder, and Listing 12.15 for her PTSD. (Id. at 20, R. 19). The ALJ further evaluated Dawn's obesity according to Social Security Rule 02-1p. (Id.).

When considering the "paragraph B" criteria for Dawn's mental impairments, the ALJ found that Dawn had moderate limitations with understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Id. at 20, R. 19).

After Step Three but before Step Four, the ALJ found that Dawn had the residual functional capacity ("RFC") to perform sedentary work with the following exertional limitations: can never climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; and can never work at unprotected heights. (Id. at 21, R. 20). The ALJ also assigned the following non-exertional limitations: limited to simple and routine tasks; and can tolerate no more than occasional interaction with the public and coworkers. (Id.).

At Step Four, the ALJ concluded that Dawn is not able to perform any of her past relevant work. (Id. at 27-28, R. 26-27).

At Step Five, relying on the vocational expert's testimony, the ALJ determined that, considering Dawn's age, education, work experience, and residual functional capacity, she was capable of adjusting to other work with jobs existing in significant numbers in the national economy in representative occupations such as an inspector, sorter, and assembler. (Dkt. 10-2 at 28-29, R. 27-28). The ALJ concluded that Dawn was not disabled. (Id. at 29, R. 28).

## IV. ANALYSIS

Dawn raises four challenges to the ALJ's decision, namely: (1) the ALJ failed to comply with Social Security Ruling 16-3p and provided no valid reason for discrediting Dawn's subjective symptom evaluation; (2) the ALJ failed to adequately provide for Dawn's moderate limitations in concentration, persistence, and pace in the RFC; (3) the ALJ erred by giving only little weight or some weight to Dawn's treating physicians' opinions, while failing to provide sound justification for dismissing the importance of these opinions; and (4) the ALJ erred in finding that Dawn's fibromyalgia was not a medically determinable impairment. (Dkt. 12).[12] The Court will consider these arguments in turn below.

### A. Evaluation of Plaintiff's Symptoms

First, Dawn argues that the ALJ did not properly evaluate her subjective symptoms as required by Social Security Ruling ("SSR") 16-3p. In particular, Dawn alleges that the ALJ failed to provide a valid reason for discrediting her subjective

---

[12] In Plaintiff's Opening Brief, she asserts three issues in her Statement of Issues. However, upon review of Plaintiff's brief, the first issue contained in the brief includes two distinct arguments. (*See* Dkt. 12 at 4, 19-24).

assessment of her own symptoms; made improper and baseless assumptions for Dawn's lack of follow-up treatment; misstated medical evidence; failed to refer to her activities of daily living; and ignored some of the elements required by SSR 16-3p. (Dkt. 12 at 19-22).[13] The Commissioner asserts the ALJ's evaluation of Dawn's subjective allegations was proper. (Dkt. 13 at 9). The Commissioner maintains that the ALJ appropriately evaluated the evidence, discussed logical inferences drawn therefrom, and satisfied her minimal duty of articulating the reasons behind her determination and building a logical bridge between the evidence and her determination. (Id. at 10-17). In reply, Plaintiff asserts that the Commissioner's response is merely improper post-hoc rationalization of the ALJ's decision. (Dkt. 14 at 1-2).

In evaluating a claimant's credibility, the ALJ must comply with SSR 16-3p[14] and articulate the reasons for the credibility determination. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). SSR 16–3p describes a two-step process for evaluating a claimant's subjective symptoms: 1) determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms; and 2) evaluate the intensity and

---

[13] The paginated numbers provided at the bottom of Plaintiff's Opening Brief do not correspond with the paginated numbers of the brief on the Docket. The Undersigned has decided to cite to the page numbers as they appear in the header of the document throughout this Report and Recommendation.

[14] SSR 16-3p became effective on March 28, 2016, replacing SSR 96-7p and requiring an ALJ to assess a claimant's subjective symptoms rather than her credibility. The "change in wording is meant to clarify that [ALJs] aren't in the business of impeaching claimants' character; obviously [ALJ's] will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original). Federal courts remain bound by prior case law concerning the credibility analysis under SSR 96-7p.

persistence of an individual's symptoms, such as pain, and determine the extent to which an individual's symptoms limit her ability to perform work-related activities. SSR 16–3p, 2017 WL 5180304 at *3-4.

When assessing a claimant's subjective symptom allegations, the ALJ must consider several factors, including the objective medical evidence, the claimant's daily activities, her level of pain or other symptoms, aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 416.929(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8. An ALJ's credibility determination is entitled to special deference, *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006), but the ALJ is still required to "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Without an adequate explanation, "neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony [was] weighed." *Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir. 2009).

An ALJ's evaluation is "patently wrong" and subject to remand when the ALJ's finding lacks any explanation or support. *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Ultimately, the ALJ must explain her subjective symptom evaluation in such a way that allows the Court to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record. *Murphy*, 759 F.3d at 816 (internal quotations omitted). Thus, "[a]s long as the ALJ's decision is

supported by substantial and convincing evidence, it deserves this court's deference." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007).

During her disability hearing, Dawn testified that she is still experiencing symptoms related to her 2008 workplace injury and the subsequent back surgeries related to that injury. (Dkt. 10-2 at 49, R. 48). Dawn testified that it is hard for her to stand and sit for long periods of time because that causes pressure on her back. (Id.). Dawn asserted that she experiences a lot of pain from her neck down to her lower back. (Id.). Dawn testified that she can stand for about an hour before needing to sit for 20-25 minutes; can sit for 1 to 1.5 hours before needing to stand, and would need to take a 15-minute break before sitting again; can only walk one city block; and cannot bend, kneel, squat, or crawl. (Id. at 49-50, 56-57 R. 48-49, 55-56). Dawn stated that she cannot sit and watch TV and follow the plotline for a long period of time because her attention deficit disorder makes it hard for her to sit and focus. (Id. at 55, R. 54). She testified that she believes she has a shorter temper than others and has had difficulties getting along with coworkers and supervisors, though she has never been reprimanded at work or lost a job because of it. (Id.). Dawn also attested to experiencing visual hallucinations once a month and auditory hallucinations every other day that distract her. (Id. at 59, R. 58).

Regarding her activities of daily living, Dawn testified that she is able to tend to her personal care, but has difficulties putting on pants. (Dkt. 10-2 at 51, R. 50). Dawn explained that she does her own laundry and cooks for herself, though her food preparation usually consists of sandwiches. (Id. at 53, R. 52). Dawn stated she

uses a cane at times, mainly to get out of bed as well as periodically throughout the day. (Id. at 51, R. 50). Dawn also stated she has good and bad days, though mostly bad, and that on bad days, she is either in her recliner or lying down in bed. (Id. at 56, R. 55).

Regarding her treatment history, Dawn testified that her spinal cord stimulator has helped her pain a little but not a lot, as she still has to take pain medications, muscle relaxers, and nerve pain pills. (Id. at 52, R. 51). Dawn also asserted that her spinal injections provided only a day's worth of relief, and that her physical therapy made her pain worse. (Id. at 57, R. 56). She also stated that her pain medications caused constipation and stomach issues. (Id.). In regards to her mental health, Dawn declared that while she was still receiving treatment for her anxiety, PTSD, and depression biweekly at St. Francis Behavioral Services, she has been unable to manage her depression. (Id. at 52-53, 57-58, R. 51-52, 56-57).

The ALJ found Dawn's subjective symptom allegations "not entirely consistent with the medical evidence and other evidence in the record." (Dkt. 10-2 at 22, R. 21). In reviewing the Plaintiff's testimony, (Id. at 22, R. 21), the medical record, (Id. at 22-25, R. 21-24), and the opinion evidence, (Id. at 25-27, R. 24-26), the ALJ concluded that "the substantial evidence of record does not confirm the disabling limitations alleged by the claimant or her representative." (Id. at 27, R. 26). Specifically, the ALJ noted an inconsistency in the medical treatment note from the Plaintiff's March 2016 visit to her primary doctor, in which she presented with normal spinal range of motion, normal mood, and normal thought, but the doctor

32

nevertheless referred her to spine specialists, pain management, and psychiatry. (Id. at 23, R. 22). The ALJ noted, however, that Dawn failed to follow through on the referrals until November 2016, at which time a physical examination revealed that she had lumbar tenderness and a positive straight leg raise test bilaterally, but she had no motor strength or gait deficits. (Id.). The ALJ also noted that the Plaintiff received bilateral sacroiliac joint injections in December 2016, but she never returned for additional injections, suggesting the initial shots successfully alleviated her pain. (Id.). The ALJ further noted that the Plaintiff reported leg weakness and imbalance to her primary doctor in April 2018 and was referred to a neurosurgeon, but she has not consulted a neurosurgeon to date. (Id. at 24, R. 23). When discussing the Plaintiff's use of her prescribed walking cane, the ALJ noted that Dawn's medical providers only observed Dawn using the cane once during the adjudicated period. (Id.). Additionally, the ALJ emphasized the inconsistency between the Plaintiff's statements that her legs were giving out on her and her comments to her doctor regarding her ability to exercise well enough to lose ten pounds. (Id.). The ALJ also highlighted Dr. Williams' observations in 2018 of Dawn's physical examinations, which revealed she had normal balance, symmetric sensation, a negative straight leg raise test, normal muscle tone, and intact cranial nerves. (Id.).

Regarding the Plaintiff's mental health, the ALJ noted that mental status examinations showed she was "alert, oriented, cooperative, expressive, and less depressed and anxious since the start of treatment. Further, the [Plaintiff] had

linear thought, adequate attention and fund of information, good memory and insight, and normal speech . . . [and] [she] denied active hallucinations." (Id.). The ALJ then remarked that in January 2017, the Plaintiff's psychiatric nurse practitioner recommended behavioral therapy, which the Plaintiff did not pursue until late 2018. (Id.). The ALJ found this delay indicative of the fact that the Plaintiff's psychological symptoms were effectively managed by her medication for much of the adjudicated period. (Id.). The ALJ further noted the Plaintiff's claims of cognitive decline, difficulty getting along with others, difficulty with concentrating, hallucinations, and her history of suicide attempts. (Id. at 25, R. 24). The ALJ then compared those claims and history to the fact that the Plaintiff has been able to provide information on her health and work history, follow the instructions of her healthcare providers, attend medical and administrative appointments, remain polite and cooperative at her appointments, avoid self-harm, manage her personal care, cook simple meals, manage her finances, shop for groceries, and care for her pets. (Id.).

Contrary to Plaintiff's assertion, the ALJ considered each of the SSR 16-3p factors. She spent substantial time discussing the objective medical evidence, (Dkt. 10-2 at 22-25, R. 21-24), she considered Dawn's allegations of pain, (Id. at 22-23, R. 21-22), she considered Dawn's treatment history, including gaps in treatment, (Id. at 22-24, R. 21-23), she considered Dawn's functional limitations, (Id. at 22-27, R. 21-26), and she also referred to Dawn's activities of daily living (Id. at 22, 25, R. 21, 24). Moreover, the ALJ did not merely recite Dawn's medical records, rather she

explained how those records were either consistent or inconsistent with Dawn's subjective symptoms.

The Plaintiff is correct in noting that at her disability hearing and in her March 9, 2017 treatment record, Dawn stated that the physical therapy she received made her pain worse. (Dkt. 10-2 at 57, R. 56; Dkt. 10-9 at 98, R. 778). This appears to conflict with statements, however, that Dawn made to her physical therapist leading up to the March 2017 visit. (Dkt. 10-7 at 129-34, R. 437-442). An ALJ can discredit hearing testimony when it conflicts with statements the claimant made to medical providers at the time of treatment. *See Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (affirming the ALJ's credibility determination where the claimant's allegations conflicted with prior statements to medical providers).

On January 11, 2017, Dawn reported to physical therapy complaining of low back pain. (Dkt. 10-7 at 133, R. 441). During her second physical therapy visit on January 18, 2017, Dawn reported "feeling the same." (Id. at 132, R. 440). There are no statements that suggest that the physical therapy was making the pain worse. During her January 19, 2017 visit, Dawn did report feeling worse after having fallen recently, but not due to the physical therapy. (Id. at 131, R. 439). Moreover, at the January 20, 2017 visit, Dawn reported that she felt "much better today since the recent fall" and that she was experiencing less pain and stiffness. (Id. at 129, R. 437). The notes from that session indicates that Dawn fairly tolerated the physical therapy. (Id.). During her fifth visit on January 23, 2017, Dawn reported "feeling the same" and the therapist noted that Dawn fairly tolerated additional exercises

and did not report any increased pain. (Id. at 127, R. 435). Plaintiff discharged herself from physical therapy ten days later. (Id. at 125-26, R. 433-34).

Dawn also correctly notes that during her hearing and in the March 9, 2017 treatment record, she stated that the bilateral sacroiliac joint injections she had received only relieved her pain for about one day. (Dkt. 10-2 at 57, R. 56; Dkt. 10-9 at 98, R. 778). However, in evaluating a claimant's subjective symptoms, an ALJ may consider inconsistencies between the severity of symptoms as stated by the claimant in hearing testimony as compared with statements made by the claimant while seeking treatment, the failure to regularly seek treatment for those symptoms, the level of treatment, and the effectiveness of treatment. *See e.g.*, *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803-04 (7th Cir. 2005); *see also Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (noting the deference given to the administrative factfinder on judicial review, as well as the regulatory guidance instructing the ALJ to consider such evidence).

Following the March 2017 visit, Dawn informed Dr. Williams, in both her August 2018 and November 2018 appointment, that her back and knee pain were 4 out of 10 and that medications and rest relieved her pain. (Dkt. 10-9 at 69, R. 749; Dkt. 10-9 at 65, R. 745; *see also* Dkt. 10-2 at 24, R. 23 (referencing 19F/1, 5)). Moreover, during her August 2018 appointment, Dawn reported that she was stable on medication and was able to lose 10 pounds as a result of her home exercise plan. (Dkt. 10-9 at 69, R. 749). This evidence supports the ALJ's findings.

Plaintiff also argues that the ALJ baselessly and improperly concluded that the "records reflect only limited and conservative treatment with physical therapy, pain management, and injections," and that Dawn's failure to return for additional bilateral sacroiliac joint injections indicated the initial shot was effective. (Dkt. 12 at 21-22). First, the ALJ's reference to conservative physical therapy, (Dkt. 10-2 at 23, R. 22), comes only after the ALJ previously noted Dawn's "history of numerous back surgeries and implantation of a spinal cord stimulator." (Dkt. 10-2 at 22, R. 21). Second, the ALJ's reference to limited and conservative treatment that Plaintiff highlights, (Dkt. 10-2 at 24, R. 23), is in relation to Dawn's post-2017 treatment, specifically Plaintiff's referral to a neurosurgeon and Plaintiff's prescription for a cane; that statement is not made in relation to Plaintiff's physical therapy, pain management, and injections. (*See* Dkt. 10-2 at 24, R. 23). Furthermore, while the ALJ's conclusion regarding Dawn's sacroiliac joint injections is not the only logical conclusion capable of being drawn from the evidence, it is not illogical. The ALJ has provided sufficient evidence to support her evaluation of Dawn's subjective symptoms.

Here, the ALJ provided evidentiary support for her evaluation of Dawn's subjective symptoms. Although the Plaintiff may not agree with how the ALJ weighed the evidence before her, the ALJ did create a logical bridge between the evidence and her conclusion. The ALJ's analysis of Dawn's subjective symptoms is therefore not patently wrong, and this Court should not overturn the ALJ's determination on this basis.

## B. Limitations in Concentration, Persistence, and Pace

Dawn next argues that the ALJ failed to adequately accommodate her moderate limitations in concentration, persistence, and pace in the residual functional capacity ("RFC") assessment. (Dkt. 12 at 23-25). In response, the Commissioner asserts that the ALJ adequately accounted for Dawn's mental limitations in the RFC. Specifically, the Commissioner argues the functional mental limitations are supported by the opinions of the state agency psychologists and Dr. Sprinkle, and Dawn has failed to identify any evidence that the ALJ ignored or which supports her assertions that her deficits were greater than outlined by the ALJ. (Dkt. 13 at 15-18).

The RFC is a measure of what an individual can do despite the limitations imposed by her impairments. *Young*, 362 F.3d at 1000. The determination of an RFC is the final responsibility of the ALJ. *Fanta v. Saul*, 848 F. App'x 655, 658 (7th Cir. 2021). When crafting a claimant's RFC, an ALJ must incorporate all of a claimant's limitations supported by the medical record, including even moderate limitations in concentration, persistence, or pace. *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019); *see also Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

In doing so, "[a]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) ("The ALJ must confront the evidence that does not support her

conclusion and explain why that evidence was rejected."). Of course, as long as the ALJ has created a logical bridge from the evidence to her conclusion, she need not address every snippet of information in the medical records that might possibly contradict the rest of the objective medical evidence. *Pepper v. Colvin*, 712 F.3d 351, 362-63 (7th Cir. 2013).

Here, in the Step Two analysis, the ALJ found that Dawn has moderate limitations in all of the "paragraph B" mental impairments. (Dkt. 10-2 at 20, R. 19). In the RFC, the ALJ limited Dawn to "simple and routine tasks" and "occasional interaction with the public and coworkers" to account for her mental limitations. (Dkt. 10-2 at 21, R. 20). This RFC finding was recited in the ALJ's hypothetical[15] to the vocational expert. (Dkt. 10-2 at 61, R. 60). Dawn contends that these limitations fail to adequately address her moderate limitations in concentration, persistence, or pace. (Dkt. 12 at 23).

Both an RFC assessment and the hypothetical posed to the vocational expert must account for documented limitations of concentration, persistence, or pace. *Paul v. Berryhill*, 760 F. App'x 460, 465 (7th Cir. 2019) (citing *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018)). Furthermore, if an ALJ relies on testimony from a vocational expert ("VE"), the hypothetical question the ALJ poses to the VE "must incorporate all of the claimant's limitations supported by the medical evidence in the record." *Varga,* 794 F.3d at 813. An ALJ must orient a vocational expert "to the totality of a claimant's limitations, " including deficiencies of

---

[15] During Dawn's disability hearing, the ALJ posed a hypothetical question to the vocational expert using language identical to this mental RFC assessment. (Dkt. 10-2 at 61, R. 60).

concentration, persistence and pace." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).

This Circuit has held that a hypothetical limiting an individual to simple, routine tasks and occasional interaction with the public is insufficient in certain circumstances to account for moderate limitations in concentration, persistence, and pace. *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018); *Yurt v. Colvin*, 758 F.3d 850, 858-59 (7th Cir. 2014). Yet, there is no "categorical rule to the effect that an ALJ may never accommodate moderate limitations in concentration, persistence, and pace with only a restriction to simple instructions and tasks." *Lothridge v. Saul*, 984 F.3d 1227, 1234 (7th Cir. 2021) (internal quotations omitted). The Seventh Circuit has established that when an ALJ determines that a claimant has moderate limitations in concentration, persistence, or pace, and then assigns work that is simple and routine, the ALJ's decision must contain some rationale to explain how the simple work restriction accommodates the claimant's particular limitations. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010); *DeChamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019); *Martin v. Saul*, 950 F. 3d 369, 374 (7th Cir. 2020). Thus, the question is whether the ALJ's RFC limitations are accurately tied to the record evidence. *Vang v. Saul*, 805 F. App'x 398, 402 (7th Cir. 2020) (quoting *Jozefyk v. Berryhill*, 923 F.3d 492, 497-98 (7th Cir. 2019)).

When crafting Dawn's RFC, the ALJ relied upon the record in its entirety and discussed Dawn's mental limitations, adequately supporting her assessment

with record evidence. First, the ALJ noted Dawn's schizophrenia spectrum disorder, bipolar disorder, generalized anxiety disorder, and PTSD diagnoses. (Dkt. 10-2 at 24, R. 23). She also noted Dawn's reported symptoms, including sadness, anxiety, mood swings, racing thoughts, poor concentration, poor sleep, and loss of interest. (Id.). The ALJ acknowledged that Dawn reported a cognitive decline, difficulty getting along with others, trouble concentrating, hallucinations, and a history of suicide attempts. (Dkt. 10-2 at 25, R. 24). The ALJ indicated this was not, however, consistent with Dawn's activities of daily living or her treatment notes, which demonstrated that Dawn was able to provide information about her health, attend appointments, describe her work history, follow instructions, and respond to questions from medical providers. (Dkt. 10-2 at 25, R. 24). While summarizing the medical evidence of record and discussing Dawn's treatment history, the ALJ noted the lack of self-harm or hospitalizations in the record during the adjudicated period. (Id.). The ALJ also noted that Dawn was able to remain independent in personal care, cook simple meals, manage her finances, and shop for groceries. (Id.).

Next, the ALJ turned to the opinions of the medical experts and state agency consultants. On March 7, 2017, Dawn had a consultative examination with Clinical Psychologist Melissa Sprinkle in which Dawn reported suffering from Bipolar II Disorder, anxiety disorders, pain, and PTSD, and stated that she could not work because of her struggles with concentration and inability to sit for more than 15 minutes or stand for more than 20 minutes without pain. (Dkt. 10-2 at 26, R. 25;

Dkt. 10-7 at 160, R. 468). Dr. Sprinkle opined that Dawn's clinical interview, chart, and mental status examination supported diagnoses of Bipolar II Disorder, depression, generalized anxiety disorder, alcohol use disorder, unspecified schizophrenia spectrum and other psychotic disorder, and PTSD. (Dkt. 10-7 at 165, R. 473). Dr. Sprinkle noted that Dawn's immediate memory was intact, including her short-term, recent, and long-term memory. (Id. at 162-163, R. 470-471). Dr. Sprinkle also noted that Dawn maintained an adequate fund of general information, conceptual ability, and analytical skills. (Dkt. 10-7 at 163-164, R. 471-472). Dr. Sprinkle opined that while Dawn's psychiatric symptoms appear to impact her daily functioning, quality of life, and social functioning, Dawn is still able to function in her daily life. (Dkt. 10-7 at 165, R. 473). In the medical source statement, Dr. Sprinkle noted that given Dawn's psychiatric symptoms, Dawn may struggle with motivation and energy to work. (Id.). Taken together, Dr. Sprinkle concluded that Dawn's psychiatric symptoms would moderately impact her ability to perform daily and work activities. (Dkt. 10-7 at 165, R. 473).

When Dawn's application was reviewed initially on March 13, 2017, state agency consultant Dr. Ken Lovko, who had reviewed the record, including Dr. Sprinkle's opinion, concluded that Dawn would have mild to moderate limitations in mental functioning, but could still understand, remember, and carry out detailed but not complex tasks, relate on a superficial basis to coworkers and supervisors, attend to tasks for a sufficient period to complete tasks, and manage the stresses involved with detailed work-related tasks. (Dkt. 10-3 at 13, R. 75; Dkt.

42

10-2 at 25, R. 24). On June 21, 2017, Dr. Kari Kennedy agreed and adopted Dr. Lovko's previous assessment. (Dkt. 10-3 at 31, R. 93; Dkt. 10-2 at 25, R. 24).

Here, the ALJ was permitted to rely on the medical experts' opinions as the basis for her RFC assessment and her hypothetical to the vocational expert. *See, Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021) (holding that the RFC was supported by substantial evidence because it included the same restrictions that doctors stated would accommodate the claimant's moderate limitations in concentrating, persisting or maintaining pace). Consistent with the findings of the state agency physicians and state agency psychological consultant, the ALJ did find Dawn had moderate limitations in concentration, persistence, and maintaining pace. (Dkt. 10-2 at 25-26, R. 24-25; Dkt. 10-3 at 13, 31, R. 75, 93; Dkt. 10-7 at 165, R. 473). The ALJ then, in reviewing the record, found that an even greater restriction was warranted than considered by the state agency physicians. Specifically, while the state agency physicians opined that Dawn could carry out detailed but not complex tasks, the ALJ in examining the record and hearing testimony found that Dawn should be limited to "simple and routine tasks" and occasional interaction with the public and coworkers. (Dkt. 10-2 at 21, R. 20). Accordingly, from the Undersigned's review of the ALJ's opinion, it is apparent that the ALJ's mental RFC limitations incorporates all of the claimant's limitations supported by the medical record, including Dawn's moderate limitations in concentration, persistence, or pace. *Urbanek v. Saul*, 796 F. App'x 910, 914 (7th Cir. 2019) ("Even generic limitations, such as limiting a claimant to simple,

43

repetitive tasks, may properly account for moderate limitations in concentration, persistence, and pace, so long as they adequately account for the claimant's demonstrated psychological symptoms found in the record.") (internal quotations omitted).

Notably, in challenging the ALJ's assessment of her ability to concentrate, persist, or maintain pace, Dawn has proposed no additional work restrictions that would address her limitations with concentration, persistence, or pace. Dawn does not refer at all to her individualized medical history or to the medical evidence of record. Moreover, the Plaintiff has failed to identify with any specificity how the RFC should have been changed to accommodate her mental limitations. *See Jozefyk*, 923 F.3d at 498 (ALJ's RFC appropriately addressed concentration, persistence, and pace where claimant hypothesized and the record supported no additional work restrictions); *Saunders v. Saul*, 777 F. App'x 821, 825 (7th Cir. 2019) (RFC upheld where assessment was supported by medical expert testimony and claimant proffered no additional restrictions); *Recha v. Saul*, 843 F. App'x 1, 5 (7th Cir. 2021) (upholding the ALJ's decision limiting the claimant to simple, routine and repetitive work with only simple changes where the claimant did not provide any other "credible medical evidence" indicating his symptoms required additional RFC restrictions to account for his limitations in concentrating, persisting or maintaining pace). Here, the ALJ built an accurate and logical bridge from the evidence to her mental RFC assessment, and Dawn has not offered any

further restrictions that should have been included in the ALJ's RFC. Accordingly, the Court should not overturn the ALJ's determination on this basis.

### C. Weight Given to Treating Physicians

Next, Dawn argues that the ALJ failed to properly consider the medical source statements of her treating physicians – Dr. Sprinkle, Nurse Practitioner Clinker, and Dr. Williams – regarding her disability. (Dkt. 12 at 25-30). Dawn alleges that the ALJ failed to provide the opinions of her treating physicians with the special deference required by Social Security Ruling 96-2p[16]. (Dkt. 12 at 29). Dawn further contends that the ALJ improperly omitted from her opinion explicit consideration of the five factors that are to be considered in determining the weight to give the treating physician's opinion. (Id.). Conversely, the Commissioner argues that the ALJ properly evaluated the opinions of Dr. Williams, Ms. Clinker, and Dr. Sprinkle. (Dkt. 13 at 18-22).

An ALJ has an obligation to evaluate every medical opinion and explain the weight given to the opinion. *Esquibel v. Berryhill*, No. 1:18-CV-159-JPK, 2019 WL 1594339, at *3 (N.D. Ind. Apr. 15, 2019). *See also* 20 C.F.R. § 416.927(c). Medical opinions, including those from a nontreating source, are weighed by considering the following factors: (1) whether there is an examining relationship; (2) whether there is a treatment relationship, and if so the length of the treatment relationship, the frequency of the examination, and the nature and extent of the treatment relationship; (3) whether the opinion is supported by relevant evidence and by

---

[16] Social Security Ruling 96-2p has been rescinded, but was still in effect for all cases, such as Plaintiff's, that were filed before March 27, 2017. SSR 96-2p, 2017 WL 3928298.

explanations from the source; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion was offered by a specialist about a medical issue related to his or her area of specialty; and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. § 416.927(c)(1)–(6).

An ALJ gives a treating physician's opinion controlling weight if "it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 416.927(c)(2); 404.1527(c)(2); *see also Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). So long as the factors are considered, the ALJ need not explicitly address each factor. *Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013) ("[W]hile the ALJ did not explicitly weigh each factor in discussing Dr. Belford's opinion, his decision makes clear that he was aware of and considered many of the factors, including Dr. Belford's treatment relationship with Schreiber, the consistency of her opinion with the record as a whole, and the supportability of her opinion."); *Cf. Shattuck v. Berryhill,* No. 1:17-cv-03978-TAB-JMS, 2018 WL 2752565, at *3 (S.D. Ind. June 8, 2018) ("While the Deputy Commissioner is correct

that the ALJ may not have to explicitly weigh every factor, the ALJ must still provide a logical bridge when rejecting a treating physician's opinion.").

      *1. Consultative Examiner Dr. Sprinkle*

On March 7, 2017, Dawn was examined by clinical psychologist Dr. Melissa Sprinkle at the request of the SSA. (Dkt. 10-7 at 160, R. 468). At the conclusion of her report, Dr. Sprinkle provided a "Medical Source Statement" in which she opined that Dawn maintained the ability to follow directions and process information, track and transition in conversation, focus for sustained periods of time, get along with others, and respond appropriately to changes in the work environment. (Dkt. 10-7 at 165, R. 473). She further opined that Dawn would struggle with maintaining motivation and energy to work. (Id.). In her decision, the ALJ gave Dr. Sprinkle's opinion "some weight," noting that Dr. Sprinkle's moderate findings were consistent with the record as a whole, particularly the repeatedly normal mental status examinations. (Dkt. 10-2 at 26, R. 25). The ALJ noted, however, that Dr. Sprinkle's opinion that Dawn's low motivation and low energy would impact her work functioning was vague. (Id.).

Pursuant to SSR 96-5p, Dawn argues that the ALJ should have contacted Dr. Sprinkle to seek clarification about the vague portions of her opinion or to provide a function-by-function analysis. (Dkt. 12 at 26). In response, the Commissioner contends the ALJ properly considered consultative examiner Dr. Sprinkle's opinion and was not required to follow-up with a source whose opinion is not self-explanatory. (Dkt. 13 at 22).

Social Security Ruling 96-5p provides that for *treating sources*, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record. SSR 96-5p, 1996 WL 374183, at *6 (emphasis added). This regulation is not applicable to Dr. Sprinkle because she is not a treating source.

Under the regulations in effect prior to March 27, 2017, a nontreating source means a physician, psychologist – including a consultative examiner – or other acceptable medical source that has examined a claimant but does not have an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.902 (effective June 13, 2011 to March 26, 2017); 20 C.F.R. § 416.927(a)(2) ("We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.").

Dr. Sprinkle falls squarely within this definition. She examined Dawn only once, and nothing in the record suggests anything "ongoing" about their treatment relationship. Instead, Dr. Sprinkle conducted this consultative evaluation to assist in determining Dawn's eligibility for disability. (Dkt. 10-7 at 160, R. 468). Thus, the ALJ was not required, as Dawn suggests, to seek clarification from Dr. Sprinkle.

### 2. *Treating Nurse Practitioner Clinker's Opinion*

Dawn next challenges the weight the ALJ gave to NP Clinker's opinion. (Dkt. 12 at 26-27). For claims filed before March 27, 2017[17], a nurse practitioner is a "medical source" but is not an "acceptable medical source" or "treating source" for purposes of the regulations. *See* 20 C.F.R. § 416.902 (effective June 13, 2011 to Mar. 26, 2017); 20 C.F.R. § 416.913(d)(1) (effective Sept. 3, 2013 to Mar. 26, 2017) (listing nurse-practitioner as a "medical source" that does not qualify as an "acceptable medical source").[18] Therefore, under the regulations, NP Clinker is a "medical source" but not an "acceptable medical source" or treating source, and her opinion is not a "medical opinion." *See* 20 C.F.R. § 416.927(a) (a medical opinion is a statement from an "acceptable medical source.").

Nevertheless, the ALJ still had to "minimally articulate" her reasons as to why she gave NP Clinker's opinion less weight. *Brumbaugh v. Saul*, 850 Fed. App'x 973, 976 (7th Cir. 2021); *Sosh v. Saul*, 818 Fed. App'x 542, 547 (7th Cir. 2020). *See* 20 C.F.R. §§ 416.927(f)(2); 404.1513(a) (2013); 404.1527(f)(2)(2020). *Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) (citing 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1502(a)(2), 404.1527(a)(1),(b),(c); SSR 06-03P, 2006 WL 2329939 (Aug. 9, 2006) (Although information from an "other source" cannot establish the existence of a medically determinable impairment, it may be used "to show the

---

[17] Here, Dawn filed her SSI application on October 26, 2016. (Dkt. 10-2 at 16, R. 15).

[18] *See also Turner v. Astrue*, 390 F. App'x 581, 586 (7th Cir. 2010) ("A nurse-practitioner ... is not a 'treating source.'"); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (defining "other sources" as including "[m]edical sources who are not 'acceptable medical sources,' such as nurse practitioners"). And, a "treating source" must be an "acceptable medical source." 20 C.F.R. § 416.927(a)(2).

severity of the individual's impairment(s) and how it affects the individual's ability to function.")). Opinions from non-acceptable medical sources are weighed using the same factors as medical sources, but not every factor will apply because the evaluation of such opinion varies case by case. *Keeley v. Berryhill*, No. 1-17-cv-03611-SEB-TAB, 2018 WL 3422129, at *4 (S.D. Ind. June 26, 2018), report and recommendation adopted, No. 1:17-cv-03611-SEB-TAB, 2018 WL 3416515 (S.D. Ind. July 12, 2018).

On February 22, 2017, NP Clinker provided a letter in support of Dawn's application for food stamps. (Dkt. 10-7 at 175, R. 483). In that letter, NP Clinker opined that based on Dawn's psychological symptoms, Dawn is unable to work until she is stable on a medication management routine. (Id.). Here, the ALJ gave two explanations for why she gave NP Clinker's opinion "little weight." (Dkt. 10-2 at 26-27, R. 25-26). First, the ALJ pointed out that NP Clinker's opinion that Dawn was "unable to work" is an administrative finding reserved to the Commissioner. (Id. at 26, R. 25). Next, the ALJ noted that NP Clinker is "not an acceptable medical source." (Dkt. 10-2 at 27, R. 26).

While the ALJ recognizes Ms. Clinker as Dawn's treating nurse practitioner, she notably does not address whether NP Clinker's opinion is consistent with or supported by other medical evidence. *Bennett v. Comm'r of Soc. Sec.*, No. 1:13-cv-00327-SLC, 2015 WL 5542513, at *8 (N.D. Ind. Sept. 17, 2015) (citing *Courtney v. Colvin*, No. 11–cv–176–WMC, 2014 WL 218219, at *5 (W.D. Wis. Jan. 21, 2014) (ALJ may not reject a nurse practitioner's report solely because nurse practitioners

50

are not considered acceptable medical sources); *Hampton v. Colvin*, No. 12 C 9300, 2013 WL 6577933, at *6 (N.D. Ill. Dec. 13, 2013) (remanding the case based on the ALJ's reasoning with respect to the nurse practitioners' opinions, recognizing that the role they played took on special significance because they provided a very large proportion of the claimant's care); *Frame v. Astrue*, No. 1:11–cv–01062–WTL–MJD, 2012 WL 3637583, at *9 (S.D. Ind. Aug. 21, 2012) (remanding case where the ALJ rejected the nurse practitioner's opinion on the sole basis that she was an "other source"). Here, the ALJ erred in failing to follow the requirements of SSR 06-03p constituting grounds for remand. Because the ALJ has failed to build an accurate and logical bridge in assessing NP Clinker's opinion, the Undersigned recommends that the ALJ's decision be remanded so that the ALJ may reconsider the opinion of NP Clinker and the impact of this opinion on the RFC analysis.

### 3. Treating Physician Dr. Williams

Dawn also challenges the weight the ALJ gave to the opinions of her treating physician, Dr. Williams. (Dkt. 12 at 27-30). Dawn contends that the ALJ's opinion fails to recognize the special deference to be given to treating source opinions, if not given controlling weight, and that the ALJ did not explicitly articulate the "checklist factors" considered as required by SSR 96-2p. (Id.). The Commissioner asserts that the ALJ properly evaluated the medical evidence, adequately articulated her reason for giving Dr. Williams' opinion "some weight," and appropriately recognized the special deference normally owed to treating physicians' opinions. (Dkt. 13 at 18-21).

Under SSR 96-2p, also known as the "treating physician rule," a treating physician's medical opinion is entitled to controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record. SSR 96-2p, 1996 WL 374188, at *1. If the ALJ provides good reasons why the testimony of the treating physician is not well supported or is inconsistent with the record, the ALJ does not need to give this testimony controlling weight. 20 C.F.R. § 416.927(c)(2). However, the ALJ must still assess the treating source's medical opinion using the factors set forth above in 20 C.F.R. § 416.927(c)(1)–(6). If the ALJ fails to explicitly list every checklist § 404.1527(c) factor, the Court will not vacate or reverse the decision, so long as the ALJ analyzes the treating physician's medical opinion within this multifactor framework. *Ray v. Saul*, 2021 WL 2710377, at *3 (7th Cir. 2021) (citing *Karr v. Saul*, 989 F.3d 508, 512 (7th Cir. 2021)). "If the ALJ discounts the physician's opinion after considering these factors, [the Court] must allow that decision to stand so long as the ALJ minimally articulate[d] [her] reasons…." *Elder*, 529 F.3d at 415 (quotations omitted).

In this case, the Undersigned finds that the ALJ met her minimal burden to articulate her reasoning for crediting and discounting certain medical opinions of Dr. Williams. Here, Dr. Williams opined that Dawn could only walk 1 to 2 blocks; sit 1 hour at once but less than 2 hours total; stand 45 minutes at once but less than 2 hours total; lift 10 pounds; must walk every 15 minutes; would require a sit/stand option; should never climb ladders, ropes, or scaffolds; should rarely twist, stoop,

climb stairs, and crouch; would be absent from work more than 4 times per month; and did not need an assistive device. (Dkt. 10-2 at 27, R. 26). In evaluating Dr. Williams' opinion, the ALJ noted that Dr. Williams personally examined Dawn in a clinical setting and thus had firsthand knowledge of Dawn's conditions and limitations. (Id.). However, she also noted that Dr. Williams' assessment was not entirely consistent with her contemporaneous treatment notes. (Id.). Specifically, while Dr. Williams' conclusion that Dawn did not require a cane was consistent with the lack of a prescription for an assistive device in the record[19], her conclusion that Dawn was limited in her ability to stand and walk was inconsistent with Dawn's physical examination results, which revealed normal balance, symmetric sensation, a negative straight leg raise test, normal muscle tone, and intact cranial nerves. (Id.). Given the inconsistencies, the ALJ found that Dr. Williams' opinion was not entitled to controlling weight. *See* SSR 96-2p, 1996 WL 374188, at *1.

After reviewing the factors listed in 20 C.F.R. § 416.927(c), the ALJ assigned "some weight" to Dr. Williams' opinion. (Dkt. 10-2 at 27, R. 26). Although the ALJ did not explicitly address each factor, the ALJ's opinion makes clear that she considered them, including the examining relationship, supportability, consistency, and specialization. In particular, the ALJ noted that Dr. Williams is Dawn's pain management doctor, that Dr. Williams personally examined Dawn, and that Dr. Williams had personal knowledge of Dawn's conditions and resulting limitations.

---

[19] The Undersigned notes that she too did not find a prescription for a cane in the record. Moreover, while Dawn states in her hearing testimony that she was prescribed a cane around 2012 when she had her back surgery, Dawn also states that she mainly uses the cane to get out of bed "or just periodically through the day." (Dkt. 10-2 at 51, R. 50).

(Dkt. 10-2 at 27, R. 26). The ALJ noted that some portions of Dr. Williams' opinion on standing and walking limitations – for instance the lack of need for a cane – was consistent with and supported by the medical record. (Id.). The ALJ, however, noted that other portions of Dr. Williams' opinion were inconsistent and unsupported by the record. (Id.). Specifically, the ALJ assessed that Dr. Williams' opinion was inconsistent with her own contemporaneous treatment notes, including physical examinations showing normal balance, symmetrical sensation, normal muscle tone, negative straight leg raise test, and intact cranial nerves. (Id.). The ALJ also noted that Dr. Williams' opinion was contrary to Dawn's report to Dr. Williams that she was more functional in her daily routine. (Id.). By providing an adequate explanation of her reasoning, the ALJ created a logical bridge to her conclusion that Dr. Williams' opinion should be given only "some weight."

### D. Fibromyalgia Determination

Lastly, Dawn contends that the ALJ disregarded the objective evidence that demonstrated that Dawn had been diagnosed with fibromyalgia, and improperly concluded that her condition was not a medically determinable impairment. (Dkt. 12 at 32-33). In response, the Commissioner asserts that the ALJ's fibromyalgia evaluation was proper. (Dkt. 13 at 23-26).

On July 25, 2012, the SSA issued SSR 12-2p entitled "Title II and XVI: Evaluation of Fibromyalgia" as guidance on how an impairment of fibromyalgia can be identified and how it should be evaluated. SSR 12-2p, 2012 WL 3104869, at *1.[20]

---

[20] As the Seventh Circuit has observed, fibromyalgia is a "common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features." *Sarchet v.*

This Ruling describes the evidence needed to establish fibromyalgia as a medically determinable impairment under the regulations. Specifically, SSR 12-2p states that the SSA will find that a person has a medically determinable impairment of fibromyalgia if the physician diagnosed fibromyalgia, provides evidence satisfying the 1990 or 2010 American College of Rheumatology (ACR) criteria, and the diagnosis is not "inconsistent with the other evidence in the person's case record." See SSR 12-2p. *Paula K. v. Saul*, No. 1:20cv318, 2021 WL 2802575, at *5 (N.D. Ind. July 6, 2021).

In other words, in addition to a diagnosis of fibromyalgia, under Social Security Rule 12-2p, there are two routes by which Dawn can establish her condition as a medically determinable impairment. *Thomas v. Colvin*, 826 F.3d 953, 959 (7th Cir. 2016) (citing SSR 12-2p, 2012 WL 3104869, at *2-3). The 1990 ACR criteria[21] requires: (1) a history of widespread pain; [22] (2) at least 11 out of a possible

---

*Chater*, 78 F.3d 305, 306 (7th Cir. 1996). Social Security Rule 12-2p notes that fibromyalgia "is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p, 2012 WL 3104869, at *2.

[21] The first method outlined in the 1990 American College of Rheumatology Criteria for the Classification of Fibromyalgia requires a history of widespread pain in all quadrants of the body and axial skeletal pain that has persisted for at least 3 months; at least eleven positive tender points on physical examination found bilaterally and both above and below the waist; and evidence that other disorders that could cause the symptoms, such as myofascial pain syndrome, polymyalgia rheumatica, chronic Lyme disease, or cervical hyperextension-associated or hyperflexion-associated disorders, were excluded.

[22] The quadrants of the body include the right and left sides of the body, both above and below the waist. SSR 12-2p, 2012 WL 3104869, at *2.

18 tender points[23] on the body; [24]  and (3) evidence that other disorders that could cause the symptoms or signs were excluded. SSR 12-2p, 2012 WL 3104869, at *2-3. The 2010 ACR[25] requires: (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and (3) evidence that other disorders that could cause the symptoms or signs were excluded. *Id.* at *3. The major difference is that the former requires positive tender points, while the latter instead relies on "manifestations of six or more [fibromyalgia] symptoms." *See* Social Security Ruling, SSR 12-2p, Titles II and XVI: Evaluation of Fibromyalgia, 77 Fed. Reg. 43640, 43641-42 (July 25, 2012) (hereinafter "SSR 12-2p").

Here, the ALJ concluded that absent objective medical evidence, significant treatment, complaints, or a workup, Dawn's fibromyalgia was not a medically determinable impairment. (Dkt. 10-2 at 19, R. 18). Specifically, the ALJ noted that while Dawn reported joint pain and fatigue, she attributed her fatigue to

---

[23] The 18 tender point sites are located on each side of the body at the occiput (base of the skull); low cervical spine (back and side of neck); trapezius muscle (shoulder); supraspinatus muscle (near the shoulder blade); second rib (top of the rib cage near the sternum or breast bone); lateral epicondyle (outer aspect of the elbow); gluteal (top of the buttock); greater trochanter (below the hip); and inner aspect of the knee. SSR 12-2p, 2012 WL 3104869, at *3.

[24] "Axial skeletal" refers to the cervical spine, anterior chest, thoracic spine, and low back. SSR 12-2p, 2012 WL 3104869, at *2.

[25] The second method outlined in the 2010 American College of Rheumatology Preliminary Diagnostic Criteria requires a history of widespread pain in all quadrants of the body and axial skeletal pain that has persisted for at least 3 months; repeated manifestations of 6 or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety, or irritable bowel syndrome; and evidence that other disorders that could cause the symptoms were excluded.

medication side effects and acute illnesses. (Id.). The ALJ noted that the record was void of tender point testing supporting a fibromyalgia diagnosis and allegations of brain fog or other cognitive decline. (Id.). The ALJ also noted that there was a lack of documentation and workup to show that other co-occurring disorders[26] were ruled out. (Id.).

While the ALJ does not specifically articulate which of the two methods she considered, it appears the ALJ attempted to consider whether Dawn's fibromyalgia diagnosis could be verified under either criteria. In particular, in line with the first method, the 1990 Criteria, the ALJ noted Dawn's history of widespread pain. (*See* Dkt. 10-2 at 19, R. 18 (5F/5; 12F; 17F/95 & 153; 19F/32) (citing medical records from November 29, 2016 to April 25, 2018 referencing joint pain). The ALJ found that "the record is void of any tender point testing." (Dkt. 10-2 at 19, R. 18). In line with the 2010 Criteria, the ALJ noted Dawn's history of joint pain and fatigue. (*See* Dkt. 10-2 at 19, R. 18) (citing medical records from November 29, 2016 to April 25, 2018 referencing joint pain). The ALJ also found that Dawn did not allege brain fog or other cognitive decline. The ALJ also noted that Dawn attributed her fatigue to side effects of her medication and acute illnesses. (Id.). In evaluating the third step, the ALJ noted that Dawn had failed to present documentation or a workup from a physician to demonstrate that her symptoms were not caused by other co-occurring disorders. The ALJ concluded that absent significant treatment, complaints or a

---

[26] Examples of other disorders that should be excluded are rheumatologic disorders, myofacial pain syndrome, polymyalgia rheumatica, chronic Lyme disease, and cervical hyperextension-associated or hyperflexion-associated disorders. SSR12-2p, 2012 WL 3104869, at *3, n. 7.

workup for the condition, Dawn failed to demonstrate that she has a medically determinable impairment of fibromyalgia. (Dkt. 10-2 at 19, R. 18).

As the Plaintiff points out, the ALJ's assessment of the evidence is not entirely accurate. First, the record does support Dawn's diagnosis of fibromyalgia. (Dkt. 10-9 at 71, 75, 102, R. 751, 755, 782). The diagnosis alone, however, is not sufficient to establish Dawn's fibromyalgia as an impairment. *Thomas*, 826 F.3d at 959. Next, the ALJ inaccurately concluded the record was "void" of any tender point testing. In fact, there were three separate visits to Dr. Williams at which the Plaintiff was found to have seventeen out of eighteen tender points. (Dkt. 10-9 at 67, 71, 75, R. 747, 751, 755). Also, when examining repeated manifestations of fibromyalgia symptoms, the ALJ correctly noted at Step Two that Dawn had reported joint pain and fatigue but appears to have incorrectly stated that Dawn had not mentioned other symptoms like brain fog or other cognitive decline. Dkt. 10-2 at 19, R. 18. When assessing Dawn's RFC, the ALJ seems to contradict her early findings stating that Dawn had reported cognitive decline. (Dkt. 10-2 at 25, R. 24). The ALJ also fails to discuss the vast amount of evidence of depression, anxiety, and irritable bowel syndrome in the record, which would seem to support a finding of fibromyalgia as a medically determinable impairment. (*See, e.g.*, Dkt. 10-7 at 80, 140, R. 388, 448; Dkt. 10-9 at 98, R. 778).

Accepting that the ALJ overlooked some treatment records and Dawn's diagnosis of fibromyalgia, the Commissioner maintains that these errors are harmless in evaluating Plaintiff's fibromyalgia because Dawn is still unable to

demonstrate that she is able to satisfy the standards of SSR 12-2p under either the 1990 or the 2010 ACR criteria. (Dkt. 13 at 24-26). Specifically, the Commissioner contends that Dawn has failed to provide evidence that other disorders that could cause her fibromyalgia-like symptoms or signs were excluded. (Id.).

In her opinion, the ALJ found that there was a lack of documentation and workup to show that Dawn's other co-occurring disorders were ruled out. (Dkt. 10-2 at 19, R. 18). The Plaintiff does not challenge this finding, nor does Plaintiff direct the Court to documentation showing that other co-occurring disorders were ruled out to establish fibromyalgia as a medically determinable impairment. (Dkt. 12 at 32-33; Dkt. 14 at 2-3). Instead, in her reply, Dawn argues that she has "already demonstrated in her opening brief, her other co-occurring conditions such as fatigue, depression, anxiety, and irritable bowel syndrome that satisfy the requirements to find fibromyalgia to be at least a medically determinable impairment." (Dkt. 14 at 2-3). While this attempts to address the 2010 ACR diagnostic criteria of repeated manifestation of six or more fibromyalgia symptoms, it fails to address the Commissioner's argument.

Both the 1990 and the 2010 ACR criteria require documentation "that other disorders that could cause the symptoms or signs" are excluded before a claimant is able to establish fibromyalgia as a medically determinable impairment. SSR 12-2p. Plaintiff has failed to demonstrate that she is able to satisfy this exclusion requirement which would assist to confirm her fibromyalgia diagnosis as a medically determinable impairment consistent with ACR criteria. SSR 12-2p. It is

well established that the burden of proving entitlement to disability insurance benefits is on the Plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970). Because the Plaintiff has failed to demonstrate that she can support her fibromyalgia diagnosis with evidence meeting either the 1990 ACR or the 2010 ACR diagnostic criteria for establishing a medically determinable impairment of fibromyalgia, there is insufficient evidence to demonstrate Dawn has a medically determinable impairment of fibromyalgia. Thus, the Undersigned does not recommend remand on this issue.

## V.    CONCLUSION

For the reasons detailed herein, the Undersigned recommends that this Court **REVERSE** the ALJ's decision denying the Plaintiff benefits and **REMAND** this matter for further consideration.

Any objections to the Magistrate Judge's Report and Recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Failure to file objections within fourteen days after service will constitute a waiver of subsequent review absent a showing of good cause for such failure.

So RECOMMENDED.

Date: 9/8/2021

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email